

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-7-2007

# USA v. Share

Precedential or Non-Precedential: Non-Precedential

Docket No. 06-2304

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"USA v. Share" (2007). *2007 Decisions.* Paper 1131.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1131

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Case No.:  06-2304

UNITED STATES OF AMERICA

v.

BENJAMIN D. SHARE,

Appellant

_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
District Court No.: 04-cr-00285-2
District Judge:  Honorable Sylvia H. Rambo

_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
April 13, 2007

Before:  SMITH and COWEN, *Circuit Judges*,
and YOHN, *District Judge\**

(Filed:   May 7, 2007)

_____

OPINION

_____

_____

\*The Honorable William H. Yohn Jr., Senior District Judge for the Eastern District
of Pennsylvania, sitting by designation.

YOHN, *District Judge*.

On September 6, 2005, Benjamin Share pleaded guilty to obstruction of justice and conspiracy to defraud the United States by receiving and giving illegal gratuities, committing wire fraud and money laundering. As a result, the District Court sentenced Share to 120 months of imprisonment. Share appeals the judgment of sentence. For the reasons that follow, we will affirm.

**I.**

Until 1985, Share acted as general attorney for the Office of Counsel of the Navy Ship Parts Control Center located at the U.S. naval base in Mechanicsburg, Pennsylvania. He was forced to submit his resignation after it was discovered that he accepted illegal gratuities. Kevin Marlowe, one of Share's co-defendants,[1] was also a federal employee at the naval base. More specifically, Marlowe worked for the Defense Information Systems Agency ("DISA") at the Defense Enterprise Computing Center ("DECC") as the Chief of Plans, Requirements and Acquisitions. One of Marlowe's duties was to supervise all employees who handled DECC's procurement activities, including the evaluation and selection of private contractors to fulfill DECC's needs for services and supplies. Share met Marlowe's father, another former employee of the naval base, during his tenure in the Office of Counsel. Through this relationship Share eventually met Marlowe and, in 1998,

---

[1]The instant case involved several co-defendants: Marlowe, David Tynio, Frederick Marlowe, Vector Systems, Inc., and Omnigraphics and Applications Design, Inc. All of the co-defendants entered guilty pleas. In addition, there are two related cases, one against Linda Marlowe and the other against Stephanie Marlowe; both of these defendants have been sentenced.

the two formed a secret partnership to develop and market a computer software program to replace the software DECC was using at that time. In furtherance of their plan, Share and Marlowe created Vector, Inc. ("Vector") and agreed that Share would run the day-to-day operations as vice-president. They also agreed that Marlowe and his wife, Linda, would act as Vector's president and treasurer, respectively; however, they would be listed in the corporate documents under the aliases "Lynn" (Marlowe) and "Brenda Nelson" (Linda).

In order to finance Vector, Marlowe began awarding government contracts to Vector and Global Services Corp. ("Global")–a company affiliated with Vector and operated by Share's son-in-law. Most of the government contracts were for information technology ("IT") personnel–Vector would hire IT personnel as consultants and provide their services to DECC for a substantial profit–and for IT products. Between 1998 and 2002, Marlowe awarded Vector and Global approximately $11.1 million in DISA contracts for various services and supplies. (App. 132-53, 504, 1015-17.) In addition, Marlowe influenced several other government officials to award Vector government contracts (*id.* at 182, 477-81, 1043-47), including two "Processing on Demand" ("POD") contracts valued at $7 million (*id.* at 182, 473-75), three IT service contracts valued at $2.8 million (*id.* at 182, 530-31), and four "Ice Pack" contracts valued at $591,000 (*id.* at 182, 477). As treasurer, Linda handled all of Vector's financial paperwork with regard to those contracts, including disbursement of payments.

Marlowe and his family received $500,000 or more in cash and benefits from

Vector for awarding the company the government contracts. Vector and Marlowe attempted to conceal the compensation paid to Marlowe for awarding Vector the contracts through various methods. For example, Vector allowed Marlowe to use its corporate credit card for personal expenses totaling $173,921; deposited $164,050 into accounts owned by Marlowe and Linda; and wrote checks totaling $17,500 to Marlowe's brother, Frederick Marlowe, who would then deposit the checks into a joint account he held with Marlowe. In addition, the parties would frequently use aliases.[2]

Eventually, an audit revealed a suspicious number of government credit card payments made by DECC to Vector. As a result, authorities initiated an investigation in May 2002. Marlowe was suspended and then removed from his position in November 2002, and ordered to return all government property in his possession. Rather than doing as ordered, Marlowe, with the help of his brother, Frederick, hid all of the government files in his possession and told DECC that he had no recollection of being in possession of any government property. Further, Marlowe and Share directed David Tynio, a Vector employee, to delete any computer files implicating Marlowe. Marlowe also returned Vector's corporate credit card to Share. In March 2003, authorities interviewed Share and served him with a grand jury subpoena. At that time, Share falsely stated that he had never met Marlowe. Share again made false statements in November 2003–when he was served with a second grand jury subpoena–by claiming that "Lynn" and "Brenda Nelson"

---

[2]In addition to "Lynn" and "Brenda Nelson," Marlowe and Linda used the aliases "Harvey" and "Brenda Scheaffer," respectively.

were the prior owners of Vector. In addition, on May 5, 2004, Share directed his attorney to tell authorities conducting the grand jury investigation that "Lynn" and "Brenda Nelson" were real people who lived in Perry County, and that "Brenda" served in the Armed Forces. These statements impeded the grand jury investigation and caused the government to expend money to search for these individuals.

Share was eventually charged with thirty-nine counts of a sixty-eight count indictment. The trial for Share and his co-defendants began on September 6, 2005. After the first week of trial, Share pleaded guilty to two counts of the indictment: conspiracy to defraud the United States by receiving and giving illegal gratuities, committing wire fraud and money laundering (Count I); and obstruction of justice (Count LXVI). The Probation Office prepared a Presentence Investigation Report ("PSR") on November 30, 2005. The PSR–citing U.S. Sentencing Guidelines Manual[3] §§ 2B1.1(b)(1)(I)[4] and

---

[3]The PSR correctly applied the 2003 edition of the U.S. Sentencing Guidelines Manual because the application of the 2005 edition would have violated the Ex Post Facto Clause of the Constitution.

[4]U.S. Sentencing Guidelines Manual § 2B1.1(b)(1) (2003), in pertinent part, provides:

> If the loss exceeded $ 5,000, increase the offense level as follows:
> Loss (Apply the Greatest)          Increase in Level
> (A) $ 5,000 or less ........................... No increase
> . . . .
> (H) More than $ 400,000 ................. add 14
> (I) More than $ 1,000,000 ............... add 16
> (J) More than $ 2,500,000 ............... add 18

§ 2B1.1(b)(1).

2C1.7(b)(1)(A)(ii)[5] (2003)–applied a sixteen-level increase in calculating Share's Offense

Level because the value obtained by the parties involved was more than $1 million but

less than $2.5 million.[6]  (PSR ¶¶ 10, 29; PSR Addendum Part 1.)  The Total Offense

Level–which was increased four levels as a result of Share's leadership role in criminal

activity involving five or more participants–was determined to be thirty-two.  (*Id.* at ¶¶

30, 36); *see also* U.S. Sentencing Guidelines Manual § 3B1.1(a) (2003).[7]

_____

[5]U.S. Sentencing Guidelines Manual § 2C1.7 (2003), in pertinent part, provides:  "If the loss to the government, or the value of anything obtained or to be obtained by a public official or others acting with a public official, whichever is greater . . . exceeded $5,000, increase by the number of levels from the table in § 2B1.1 . . . ."  § 2C1.7(b)(1)(A)(ii); *see supra* note 4.

[6]The PSR found that the best estimate of the value obtained by the parties under § 2C1.7 was the net income Vector made on the government contracts it received as a result of Marlowe's influence.  (PSR ¶¶ 10, 29; PSR Addendum Part 1.)

[7]U.S. Sentencing Guidelines Manual § 3B1.1(a) (2003) provides:  "If the defendant was an organizer or leader of a criminal activity that involved five or more people or was otherwise extensive, increase by 4 levels."  § 3B1.1(a).  A "participant" under § 3B1.1 "is a person who is criminally responsible for the commission of the offense, but need not have been convicted."  § 3B1.1 application note 1.  The application notes state that a defendant qualifies for this upward departure if he was "the organizer, leader, manager, or supervisor of one or more other participants."  § 3B1.1 application note 1.  To determine whether a defendant played a leadership role, the court should consider:

> [T]he exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.  There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.

§ 3B1.1 application note 4.  Even when the criminal activity involves fewer than five participants, a defendant who was a leader in the criminal activity will qualify for the four-level increase if the criminal activity was otherwise extensive.  § 3B1.1 application note 3 ("In assessing whether an organization is 'otherwise extensive,' all persons involved during the

Share objected to the sixteen-level and four-level increases.  He argued that the

sixteen-level increase under §§ 2B1.1(b)(1)(I) and 2C1.7(b)(1)(A) was improper because

the loss to the government or the value of the compensation received by Marlowe (a

public official) or others acting with him did not exceed $1 million.  Further, Share

contended that the four-level increase was unjustified because he played only a limited

role in the criminal activity.  At his sentencing hearing, which was held on March 28,

2006, the District Court overruled Share's objections and adopted the PSR without

change.  (App. 1065.)  In doing so, the District Court concluded that the loss to the

government was not reasonably determinable under § 2C1.7; therefore, the court used the

net income Vector received from the contracts awarded by Marlowe or other government

officials influenced by him to determine the value of anything obtained by Marlowe or by

others acting with him.[8]  (*See* App. 1054-55; PSR Addendum Part 1.)  The District Court

estimated that amount to be $1,221,746–Vector's net income from 1998 through 2003.

---

course of the entire offense are to be considered.  Thus, a fraud that involved only three
participants but used the unknowing services of many outsiders could be considered extensive.").

[8]For purposes of determining "loss" under § 2C1.7, the application notes to the
Guidelines provide:

> The court need only make a *reasonable estimate* of the loss.  The
> sentencing judge is in a unique position to assess the evidence and
> estimate the loss based upon the evidence.  For that reason, the
> court's loss determination is entitled to appropriate deference.

§ 2B1.1 application note 3(C) (emphasis added); *see also* § 2C1.7 application note 3 (stating that
"'[l]oss' . . . shall be determined in accordance with Application Note 3 of the Commentary to §
2B1.1").

7

The District Court did not add any amount for the value received by Share, Tynio, Omnigraphics and Applications Design, Inc. ("Omnigraphics"), Marlowe and his family directly. (App. 1055-56.) In rejecting Share's objection, the District Court found that Vector had no income from a legitimate source from 1998 through 2003. Thereafter, the District Court sentenced Share to 120 months of imprisonment–sixty months of imprisonment for each count, to be served consecutively. Share timely appealed.

**II.**

We have jurisdiction to review this appeal under 28 U.S.C. § 1291 as a final decision of the District Court and pursuant to 18 U.S.C. § 3742(a)(1) for sentences imposed in violation of law. *See United States v. Cooper*, 437 F.3d 324, 326-28 (3d Cir. 2006). While we exercise plenary review over the District Court's interpretation of the Constitution and the advisory Sentencing Guidelines, we review the District Court's factual findings under a clearly erroneous standard. *United States v. Grier*, 475 F.3d 556, 561 (3d Cir. 2007) ("Under an advisory Guidelines scheme, district courts should continue to make factual findings by a preponderance of the evidence and courts of appeals should continue to review those findings for clear error."). A factual finding is clearly erroneous when, after reviewing the evidence, we are "left with the definite and firm conviction that a mistake has been committed." *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 622 (1993). "A sentence imposed as a result of a clearly erroneous factual conclusion will generally be deemed 'unreasonable' and, subject to the doctrines of plain and harmless error, will result in

remand to the [D]istrict [C]ourt for resentencing." *Grier*, 475 F.3d at 570 (citing *United States v. Booker*, 543 U.S. 220, 268 (2005)).

**III.**

On appeal, Share argues that his sentence is unreasonable because it was imposed as a result of two clearly erroneous factual findings. First, Share asserts that the District Court clearly erred in finding that the value of anything obtained by Marlowe or others working with him exceeded $1 million. Second, Share contends that the District Court clearly erred in finding that he had a leadership role in the criminal activity involving five or more participants. For the reasons that follow, we will reject Share's claims and affirm the District Court's judgment of sentence.

**A.**

With regard to his first claim, Share argues that the District Court clearly erred in finding that the value of anything obtained by Marlowe or others working with him exceeded $1 million; therefore, the sixteen-level increase to his base Offense Level was improper. In support of this argument, Share asserts that Marlowe received an amount less than $400,000 for his involvement in the criminal activity. Further, Share contends that the District Court overstated Vector's income derived from its inappropriate relationship with Marlowe–the District Court found that "Vector had no legitimate business income between 1998 and April 2003" and that it had received $1,221,746 as a result of its criminal activity with Marlowe. (App. 1055.) Share claims that a significant percentage of Vector's income from 1998 to 2003 actually came from legitimate sources.

In addition, Share argues that the District Court erred in its application of §
2C1.7(b)(1)(A)(ii) by combining the value of anything obtained by Marlowe *and* by
others acting with him rather than choosing the greater of the value of anything obtained
by Marlowe *or* the value of anything obtained by others acting with him.

In response, the government notes that Vector's financial records show that it had
no revenue prior to October 1998 when it received its first contract from Marlowe.
Further, the government argues that the District Court rejected Share's contention that
Vector received income from legitimate sources during the relevant time period because,
although Vector was awarded contracts by government officials other than Marlowe, the
testimony of those government officials shows that Marlowe influenced their decisions to
award Vector the contracts. Thus, the government asserts that the District Court did not
clearly err in finding that Vector had no legitimate source of income from 1998 to 2003
and that Vector had a net income that exceeded $1 million during that period.

The District Court did not commit clear error in finding that Vector obtained
$1,221,746, which represents Vector's net income from 1998 through 2003, excluding
any amount of value obtained by Share, Tynio, Omnigraphics, Marlowe and his family.
This figure was a reasonable estimate of Vector's net income between 1998 and 2003.
*See supra* note 8. In making its estimate, the District Court relied on Vector's annual
profit and loss reports from 1998 through April 15, 2003. (*See* App. 506-15.) Those
reports show that Vector's net income for that time period totaled more than $1.2 million.
(*Id.*) If anything, the District Court's estimate understated, rather than overstated, the

10

amount of profit obtained by Vector. Notably, a chart used by Share during the opening statement at his trial claims that Vector's net income from 1998 through 2003 amounted to $1,742,843. (App. 116.) In addition, in making its estimate, the District Court did not "take into account the Government's argument that Vector disguised non-legitimate business expenses in an attempt to reduce the net profit of Vector" nor did it consider a letter from Share–dated September 26, 2002–to a U.S. General Services Administration contracting officer stating that the net income of Vector for the first half of 2002 exceeded $1.3 million. (App. 1054-55.) The District Court stated:

> Finally, the [$]1.2 million does not consider . . . Vector's tax returns are filled with fraud. The [$]1.2 million is a conservative figure that is based on information provided by Vector to the grand jury. With respect to Vector's net profit, the Court adopts the Government's contention that Vector was not a viable entity until 1998 when it began receiving DISA contracts from Kevin Marlowe.
>
> The Court adopts the Government's argument that Vector had no legitimate income between 1998 and April 2003. The only source of Vector's income were contracts awarded by Kevin Marlowe or someone Kevin Marlowe influenced to award the contracts. Now the $1.2 million does not include the amount received by Mr. Share. $258,700.00. Nor does the [$]1.2 million include benefits received by Tynio, Omnigraphics, which total $81,610.00.
>
> Finally, the [$]1.2 million does not include approximately $500,000 in benefits received by Kevin Marlowe and his family.

(*Id*. at 1055-56.) As shown by the above excerpt, the District Court's reasonable estimate was conservative and not clearly erroneous. Likewise, the District Court did not clearly err in finding that none of the $1,221,746–Vector's net income from 1998 to 2003–came from a legitimate source. Share's argument that Vector received legitimate income from

11

contracts awarded to Vector by other independent government officials is without merit. As the government correctly notes, other government officials who awarded Vector contracts stated that they were influenced by Marlowe. (*See id.* at 473, 477, 480-81, 1015-17, 1043-50.) Therefore, we conclude that the District Court did not clearly err in finding that none of Vector's net income from 1998 to 2003 came from a legitimate source.

Further, we reject Share's argument that the District Court erred in its application of § 2C1.7(b)(1)(A)(ii) by combining the value of anything obtained by Marlowe *and* by others acting with him rather than choosing the greater of the amount of value obtained by Marlowe *or* the amount of value obtained by others acting with him. Section 2C1.7(b)(1)(A)(ii) states, "If the loss to the government, *or* the value of anything obtained or to be obtained by a public official or others acting with a public official, whichever is greater . . . exceeded $5,000, increase by the number of levels from the table in § 2B1.1 . . . ." § 2C1.7(b)(1)(A)(ii). As is evident from the text, the disjunctive in this statement allows the District Court to calculate either the loss to the government or the value of anything obtained by all parties involved, including the public official. To read an additional disjunctive into the clause "the value of anything obtained . . . by a public official *or* others acting with a public official" would strain the text of § 2C1.7(b)(1)(A) and render a perverse result. Notably, other than providing definitions for the word "or," Share proffers no support for his interpretation of §2C.1(b)(1)(A). Finally, the figure–Vector's net income from 1998 through 2003–used by the District Court in

12

calculating the increase to Share's base Offense Level under §§ 2C1.7(b)(1)(A)(ii) and 2B1.1 excluded the approximately $500,000 obtained by Marlowe and his family. Thus, even if we were to accept Share's argument, our conclusion would not change. Therefore, we conclude that the District Court did not err in its application of § 2C1.7(b)(1)(A)(ii).

**B.**

In his second claim, Share asserts that the District Court committed clear error in finding that he was a leader of criminal activity involving five or more participants. In support of this assertion, Share argues that he played a minor role in the criminal activity. Further, Share argues that the criminal activity involved fewer than five participants because Linda, Frederick, and Vector did not qualify as "participants." Therefore, Share contends that the four-level increase to his Total Offense Level was improper. We disagree.

The District Court adopted the PSR, which found that the criminal activity involved five individual participants: (1) Marlowe, (2) Linda, (3) Share, (4) Tynio, and (5) Frederick. Share concedes that he, Marlowe, and Tynio were properly found to be "participants" in the criminal activity under § 3B1.1 of the Guidelines (*see* Appellant's Br. 26.); however, he argues that the District Court clearly erred in finding that Linda and Frederick were participants in the criminal activity, which in this case involved conspiracy to defraud the United States and obstruction of justice. The record reflects otherwise. *See supra* note 1. Frederick assisted his brother, Marlowe, in laundering

13

money by accepting payments from Share and depositing them into a bank account he and Marlowe jointly held. Frederick also obstructed an investigation by assisting Marlowe in hiding government contract files and lying during a grand jury investigation. With regard to Linda, the record shows that she handled all of the record keeping for Vector, which was fraudulent, and disbursed improper payments made by Vector. (*See* App. 494; Supplemental App. 1-4.) In addition, Linda used aliases to hide her identity as Marlowe's wife and Vector's treasurer. Linda also received compensation from Vector on Marlowe's behalf and made false statements to the grand jury. Both Frederick and Linda have been sentenced to terms of imprisonment for their participation in the criminal activity. Thus, we conclude that the District Court did not clearly err in finding that the criminal activity involved five individual participants: (1) Marlowe, (2) Linda, (3) Share, (4) Tynio, and (5) Frederick. As such, we need not address Share's argument that corporations–such as Vector–do not qualify as "participants" under § 3B1.1.

Further, even if we were to accept Share's assertion that the criminal activity involved fewer than five participants, we would nevertheless affirm the District Court's application of § 3B1.1 because the District Court also found that the criminal activity was otherwise extensive–a finding that was not clearly erroneous. *See supra* note 7. In determining whether a criminal activity is extensive under § 3B1.1, "the focus [is] upon the number and roles of the individuals knowingly, and unknowingly." *United States v. Helbling*, 209 F.3d 226, 245 (3d Cir. 2000). Here, the criminal activity involved many more than five knowing and unknowing individuals, including Share, Share's son-in-law,

14

Tynio, Marlowe, Linda, Frederick, Vector's employees and independent contractors, and the other government officials who awarded Vector government contracts due to Marlowe's influence. Share, Marlowe, Linda, Frederick, and Tynio had significant roles in the criminal activity. Further, the criminal activity occurred over a four-year period of time and involved at least $11 million. (*See* App. 132-53, 504, 1015-17.) Thus, even if we were to assume that the District Court clearly erred in finding that the criminal activity involved five or more participants, we would nevertheless reject Share's argument as the District Court did not clearly err in finding that the criminal activity was otherwise extensive.

Lastly, we reject Share's assertion that he had a limited or minor role in the criminal activity. There is more than sufficient support in the record for the District Court's finding that Share played a leadership role in the criminal activity. *See supra* note 7. When interviewed, both Linda and Tynio admitted that it was Share who had hired them and that they followed his orders. (Supplemental App. 1-2, 6-8.) In addition, Share directed the illegal gratuities to a public official–Marlowe–and compensated and supervised the other co-conspirators. Share also directed Tynio to destroy evidence, incorporated all the businesses involved in the criminal activity, and operated Vector. Significantly, it was Share and Marlowe who primarily planned and organized the scheme to defraud the United States. Finally, his "share of the fruits of the crime" was second only to Marlowe. *See* § 3B1.1 application note 4. Thus, we are unable to conclude that the District Court clearly erred in finding that Share had a leadership and not a minor or

15

limited role in the criminal activity.

For the foregoing reasons, we conclude that the challenged factual findings of the District Court are not clearly erroneous and, therefore, the sentence is not deemed unreasonable. Accordingly, we will affirm the District Court's judgment of sentence.